ARTHUR G. STEWART
*vs.*
ESTATE OF CARRIE K. STEWART

Kennebec.   Opinion, February 17, 1953.

422

*Richard B. Sanborn,* for plaintiff.

*Charles A. Peirce,* for Clarence Stewart.

SITTING: MURCHIE, C. J., FELLOWS, MERRILL, NULTY, JJ. WILLIAMSON, J., dissenting. THAXTER, J., did not sit.

FELLOWS, J. This case comes to the Law Court on exceptions by Arthur G. Stewart to a decree of a Justice of the Superior Court for Kennebec County, sitting as the Supreme Court of Probate. The decree found no error on the part of the Judge of Probate for Kennebec County in allowing certain payments in the account and private claim of Clarence E. Stewart testamentary trustee and life beneficiary. This decree of the Supreme Court of Probate dismissed the appeal, taken from the Probate Court by remainderman Arthur G. Stewart, and the pending exceptions by him were taken.

The facts are these: Carrie K. Stewart died in 1936, and at the time of her death she had, as near relatives, a son Clarence Elmer Stewart, and a grandson (the son of a deceased son) Arthur Gilbert Stewart.

The will of Carrie K. Stewart provided (1) that her son Clarence Elmer Stewart should have his father's writing desk for his life, and upon his decease the desk to go to her grandson Arthur Gilbert Stewart, (2) the sum of $500 was

given to a Spiritualist Society, (3) the home place with lots and furnishings was given to the trustee under the will, in trust for the grandson Arthur Gilbert Stewart with right on the part of the trustee to sell if "wise and best." The trust to continue until the grandson is twenty-one, (4) to a grandniece "my Springer highboy," (5) then comes the fifth paragraph of the will which is now directly in issue, and is as follows:

"Fifth: I give, devise, and bequeath the remainder and residue of my property be it real or personal to my trustee hereafter named. The said property to be held in trust for the use and benefit of my son Clarence Elmer Stewart. The Trustee to have the right to sell or dispose of real estate, and to place the proceeds on interest, for the benefit of my son Clarence Elmer Stewart the rest of his natural life, at his demise, the same or what remains, shall go to my grandson Arthur Gilbert Stewart, forever."

The inventory of the estate of Carrie K. Stewart filed in June 1938, listed real estate as of the value of $3,000 and the rights and credits $1,746.87, a total of $4,746.87. The first account of Clarence E. Stewart, allowed for the three-year period January 1, 1944 to January 1, 1947, showed gross income from rent and bank interest of $1,716.47, with total expenditures for ordinary repairs, water rates, taxes, and insurance, as $755.10. The net income of $961.37 was paid to Clarence E. Stewart.

The second account of Clarence E. Stewart as trustee, allowed for the years January 1, 1947 to January 1, 1950 showed gross income $1,872.84 and after payment of taxes, ordinary repairs, water rates, and insurance, the net income $1,215.73.

The third and final account, now in dispute in these proceedings, for the period January 1, 1950 to April 4, 1951,

shows gross income $817.22 with the claimed expenses totalling $683.25 (which final account with a bill for outside painting, contains the disputed items in Clarence E. Stewart's private claim for permanent improvements and unusual repairs, which he asks to be taken from the bank deposits of the trust, and amounts to $596.28. This is objected to by Arthur G. Stewart the remainderman).

Woodbury Wallace, named in the will, was first appointed executor and trustee. Upon Wallace's resignation, Clarence E. Stewart, the life tenant, was appointed trustee May 22, 1944 and acted as such until he was removed by the Probate Court in April, 1951, on the petition of Arthur G. Stewart, appellant, for alleged lack of proper notice to said Arthur G. Stewart when Clarence E. Stewart was first appointed, and because "impartial trustee should be appointed." Arno A. Bittues was appointed trustee April 4, 1951.

The real estate referred to in the fifth paragraph of the will has been rented since 1936, and the trustee accounts have been filed by Clarence E. Stewart as trustee during the years 1944-1949 and allowed by the Probate Court. The third and final account and private claim filed by Clarence E. Stewart and now objected to, includes contested items for rewiring house, for new ceilings in dining room and kitchen, for copper tubing to toilet, for new roof, for wiring for electric stove, and for outside painting of house, which the agreed facts show were initially paid by Clarence E. Stewart from his own personal funds.

On July 23, 1951, the Probate Court allowed the account and the private claim of $596.28 to Clarence E. Stewart, and the court stated in its decree as follows:

"It seems to be clearly the law in this state that when a life estate in both real and personal property has been granted, a devise of whatever remains or the use of words of similar import an-

nexes to the life estate by implication a power of disposal. Therefore, it seems to the Court that in the instant case the testatrix in using the words 'the same or what remains' intended that the trustee within the limits of reasonable discretion could also draw on the corpus of the trust for the use and benefit of the life tenant.

The testatrix, in setting up this trust, was providing for her own son, who was her only living child, her only other child (a son) had predeceased her. She had already made provision in the third clause of her Will for the grandson, Arthur Gilbert Stewart, who is the son of her deceased son. And after providing for her son she directs the disposition of the property remaining at his death - - - - which appears to be a plain implication that the corpus of the estate might be or was likely to be diminished during her son's life, for to conclude otherwise, would be to give very little or no practical significance to the word remain."

An appeal was taken by Arthur G. Stewart from this decree of the Probate Court allowing the final account and claim of Clarence E. Stewart, for the reason that "it is the duty of a trustee to take care of repairs on a building in his trust and only to turn over the net income." Upon hearing in the Supreme Court of Probate, the justice presiding found no error in the Probate Court's decision, and dismissed the appeal. The decision of the Supreme Court of Probate said in part:

"Testatrix had two objects of her bounty, her son and her grandson. By the third clause she provides directly and substantially for the grandson. By the fifth clause she provides that the residuum of her estate be held in trust for the 'use and benefit' of her son. She further gives her trustee the express right to dispose of the real estate and put the proceeds at interest. At the death of the son, 'the same or what remains' goes to the grandson. The intention is plain. The words used are broad

in scope. It is apparent that the principal may be invaded for the 'use and benefit' of the son, and the remainder over is purely incidental to main intent and purpose of the clause which was designed to offer broad protection to the son during his life. There was no error in the court below in allowing the payments charged to principal and decree must be 'Appeal Dismissed.' "

The bill of exceptions states that the Supreme Court of Probate was in error in holding that (1) "the work done here might properly be classed as unusual repairs," (2) in error in holding that "the principal may be invaded for the use and benefit of the son," and (3) in error in holding that "there was no error in the court below in allowing the payments charged to principal."

We have not been able to find any authoritative case, and no such case has been called to our attention, where the words in a will, that establish a *trust* and provide for termination of a *trust*, contain provision for "what remains." It is an unusual trust provision and places this case in a new and separate class among the multitude of classified will provisions.

The decisions are numerous in this and other states holding that the intention is always the controlling rule, and that when a deed or a devise of a life estate, to an individual for life, uses the phrase "what remains," the words either give implied powers to sell or otherwise dispose of the property, or else the words have no meaning whatever. *Loud* v. *Poland,* 126 Me. 45; *McGuire* v. *Gallagher,* 99 Me. 334; *Young* v. *Hillier,* 103 Me. 17.

The intention of a testator must be collected from the language of the whole instrument interpreted with reference to the avowed or manifest object of the testator; and all parts of the will must be construed in relation to each other so as to give to every provision its proper field of

operation, and to every word its natural and appropriate meaning. In case of ambiguity or apparent contradiction, the surrounding circumstances as to property and family should be taken into consideration. *Bodfish* v. *Bodfish,* 105 Me. 166.

"All authorities have recognized for generations that a last will and testament executed according to existing statutes is the final declaration of a person in regard to the disposition of his property. The name itself certifies that it is his 'testimony' upon that subject, and is the expression of his 'mind' and 'will' in relation to it. The right to make a will is not a natural right, but is a privilege granted by statute, that permits the owner of property to direct use and ownership after his death. It has always been recognized that a testator may make any disposition of his property that he desires, if it is not inconsistent with the laws, or contrary to the policy of the state. It is the true intention of the testator that governs primarily, in the construction of words used to express that intention. 'The intent of a testator is not to be thwarted unless some positive rule or canon of construction makes it necessary.' Ellms v. Ellms, 140 Me. 171; 35 A. (2nd) 651. 'If you once get at a man's intention, and there is no law to prevent you from giving it effect, effect ought to be given to it.' Merrill Trust Co. v. Perkins, 142 Me. 363; 53 A. (2nd) 260, 262. ***** If the will to be construed does not violate some positive rule of law, the intentions of the testator must prevail; and when one considers the differences as well as the similarities in sane human minds, with their capacities for reasonable or unreasonable wishes, likes, dislikes, hopes and fears, it should be understood that no fixed and definite path can be found for all. Some wills must necessarily be, and often are, outside the common and ordinary pathway. 'No two testators are situated precisely the same, and it is both unsafe and unjust to interpret the will of one man by the dubious light af-

forded by the will of another.' Bradbury v. Jackson, 97 Me. 449; 54 A. 1068, 1070."

*U. S. Trust Co.* v. *Douglass*, 143 Me. 150, 154, 159.

Ordinarily, where an individual holds a life estate with remainder over, no temporary repairs can be charged to capital. "The life tenant whether legal or equitable cannot, as a general rule, incumber the remainder." *Veazie* v. *Forsaith*, 76 Me. 172. It is sometimes stated that "a tenant for life must make all ordinary repairs necessary to preserve the property and prevent its going to waste unless there is some provision to the contrary in the instrument creating the estate." He is not bound, however, to make unusual or extraordinary repairs and permanent improvements. What constitutes unusual, temporary or permanent repairs depends on circumstances. See 21 Corpus Juris "Estates," 951, Sec. 90; 31 C. J. S. "Estates," 55, Sec. 44; 33 Am. Jur. "Life Estates," 976-989, Secs. 448-458; Annotation in 128 A. L. R., 252 citing *Veazie* v. *Forsaith*, 76 Me. 172, and Annotation in 175 A. L. R. 1434. The authorities without exception, however, recognize that where the instrument creating the life estate, or creating the trust, is a will, the intention of the testator as therein indicated or expressed, is the controlling rule.

It is the will of Carrie K. Stewart and her intention, as indicated in the will, that controls the results in the case under consideration. The will recognizes two persons as the objects of her bounty. One person is her son and the other the son of a deceased son. Mrs. Stewart gives her "home place for the use and benefit of my grandson Arthur Gilbert Stewart" and this first trust (not in dispute) is to exist "until my said grandson attains the age of twenty-one years." She then gives the remainder of her property real and personal to the trustee (which is in dispute) "for the use and benefit of my son Clarence Elmer Stewart." The trustee is to have the right to sell or dispose of real estate,

and to place the proceeds on interest for the "benefit of my son Clarence Elmer Stewart the rest of his natural life" and "at his demise, *the same or what remains* shall go to my grandson."

We have examined with care the record containing the will, the probate accounts, and this disputed claim for unusual repairs and improvements, and we are not able to find that the Justice of the Superior Court sitting as the Supreme Court of Probate was in error in allowing the disputed accounts which had been allowed in the Probate Court. The testatrix left the residue for the "use and benefit of my son Clarence Elmer Stewart." She did not limit the "use and benefit" to net income after all expenses of every nature. During the past fifteen years the expenses of ordinary repairs, to keep the property rentable, the taxes, insurance, water rates, and ordinary painting and papering have properly been paid by the trustee from rents received. Clarence Stewart has received the net balances. The testatrix did not intend, however, that her son, Clarence Stewart, as life beneficiary should be required to permanently improve the property for the benefit of a grandson already liberally provided for. The grandson is to have "what remains." The son has the "use and benefit."

The charges in the accounts were carefully passed upon by the Probate Court, and we cannot say that, under the terms of the will and under all the existing circumstances, the disputed items for rewiring, new ceilings, copper tubing, new roof, and complete outside painting were not for "permanent and unusual" repairs or improvements, and we cannot say that they were not properly approved. We must adopt, as above quoted, the reasoning of the Kennebec Probate Court, and the reasoning in the finding and decree of the Justice of the Superior Court sitting as Supreme Court of Probate. No other construction gives effect to all the terms of this will.

*Exceptions overruled.*

## DISSENTING OPINION

WILLIAMSON, J. I would sustain the exceptions. The son has requested reimbursement for expenditures chargeable, in his view, against principal and not against income. He has not asked that principal be paid to him under the "use and benefit" clause. His claim reads in part: "that it is necessary to protect the real property * * * that * * * $596.28 * * * be expended in making permanent repairs on the buildings."

The claim deals with investment of trust funds in the real estate and not in the destruction of the trust principal through invasion.

The testatrix had no intention that the trustee under her will could deviate from normal practice in the management of the trust estate. The propriety of expenditures, the liability of the trustee, or the trust property for charges, the apportionment of charges between income and principal, including the allocation of such charges, all are matters of trust management. They do not involve the exercise of a discretionary power to dispose of the principal by the trustee. In this instance this power has been exercised by the court below for the son surely had no such power under the will.

If the son wishes to obtain money by invasion, and thus the destruction in part of the principal of the trust established by his mother for himself and her grandson, he should make his request in plain terms. I would treat the case as a problem in the management of a trust without considering its partial destruction through invasion.

STATE OF MAINE

SUPREME JUDICIAL COURT

Law Term ·
Portland
February, 1953

## ORDER FIXING TIMES FOR BAR EXAMINATIONS

Pursuant to the provisions of Section 1 of Chapter 93 of the Revised Statutes of Maine of 1944 it is

ORDERED that the Board of Examiners for the examination of applicants for admission to the Bar be and hereby are directed to hold sessions at Bangor or Orono in the County of Penobscot on the first Wednesday of February in each year and at Portland on the first Wednesday of August in each year, for the purpose of examining all applicants for admission to the bar, as to their legal learning and general qualifications to practice in the several courts of the state as attorneys and counselors at law and solicitors and counselors in chancery, and that this order supersedes any and all prior orders of this Court with respect to the holding of any sessions of said board after the date hereof.

By the Court

HAROLD H. MURCHIE
*Chief Justice*

February 10, 1953.
A true copy.

Attest:

HAROLD H. MURCHIE
*Chief Justice*