560 P.2d 410

Eugene Lee AMATOR and Betty Jean Amator, husband and wife Individually, and Eugene Lee Amator as Executor of the Estate of Bert Amator, Appellants and Cross-Appellees,

v.

William L. AMATOR, Bert V. Amator, Ernestine Shahan and Eva Martin, Appellees and Cross-Appellants.

No. 12663.

Supreme Court of Arizona, In Division.

Jan. 26, 1977.

Hill & Savoy by John E. Savoy, Cheryl E. Hendrix, Phoenix, for appellants and cross-appellees.

Donald J. Kenney, Ltd. by Donald J. Kenney, William B. DeMars, Phoenix, for appellees and cross-appellants.

HAYS, Justice.

This action stems from the distribution of the assets of a family farm. After Bert Amator, Sr., died in November, 1971, four of the sons and daughters brought this action against another son, Eugene, and his wife in an attempt to retrieve to the estate of their mother certain personal property given to Bert, Sr., for life, the remainder to go to the children. It was alleged that a sale of a certain part of the property, to wit, a dairy herd and milk base, was improper and beyond the authority of Bert, as

life tenant and in contravention to the rights and interests of the remaindermen. The plaintiffs sought an accounting or in the alternative the imposition of a constructive trust on the defendants, Eugene and his wife, who purchased the life estate property from Bert.

The case is on appeal to this court after a trial without a jury in which judgment was had in favor of the plaintiffs in the sum of $12,500. We have jurisdiction pursuant to 17A A.R.S. Rules of the Supreme Court, rule 47(e). The facts and history of the family which gave rise to this litigation are as follows.

In 1917 a dairy farm was started by Bert and Alice Amator southwest of Phoenix. In 1949 the farm became known as Amator and Sons, operating in a partnership format between Bert, Glen and Eugene, though without any formal partnership agreement. Before long, Glen left the partnership with William, another brother, taking his place. Under the informal arrangement, the profits of the dairy operation were equally divided amongst the three but the capital assets of the farm remained owned by Bert and Alice.

In 1953, the mother, Alice Amator, died leaving, by her will, her one-half interest in the community property, comprised primarily of the assets of the farm, to Bert Amator, for his lifetime; and upon his death the farm was to be divided equally among the couple's six children. The probate proceedings of Alice's will recognized the dairy farm to consist of the real property, various items of farm machinery, 55 cows and 40 heifers. The proceedings concluded that a life estate was created in one-half of the property in Bert, with the remainder to the children upon his death.

In 1959, the United Dairymen of Arizona established a so-called milk base which is a marketing right that a dairyman needs in order to market milk through that particular organization. Amator and Sons, as a partnership, purchased 4,129 pounds of milk base from 1959 through 1963.

In 1966, William left the business, selling several cows and heifers and 1300 pounds of milk base comprising his interest in the farm to Eugene. Later that same year, Bert had a stroke and as a result, he was unable to continue running the farm. Pursuant to a family agreement, Eugene assumed management of the farm and agreed to pay Bert $150 a month, keeping any other profits.

In 1968, Eugene and his wife personally purchased 1000 pounds of milk base for $12,500, which purchase was financed through the Amator and Sons' account at Production Credit Association (hereinafter referred to as P.C.A.).

In 1971, Eugene arranged to buy Bert's entire interest in the dairy farm. Pursuant to their informal agreement, Eugene was to pay Bert $150 to $200 a month for the 1377 pounds of milk base and was to assume all the dairy farm's current debts at P.C.A. which totalled $47,167 in return for the 40 cows and some 20 or 25 heifers then owned by Bert.

Later that year Bert died. Soon thereafter Eugene paid to Bert's estate the balance still outstanding on the sale of the milk base.

Suit was brought to obtain an accounting from the defendants, Eugene and his wife, for the dairy herd or any profits derived from its sale to a third person; to obtain an accounting for any increase or decrease in the value of the milk base; and to void the transfer to Eugene of the milk base on the grounds that the sale was the product of coercion and unfair persuasion and was for inadequate consideration.

The court below found that Bert, as life tenant, had the power to consume or sell any of the property subject only to the duty not to waste the property and that the milk base never constituted a part of the life estate. The court further found that there were no unfair dealings on the milk base sale; that the agreed upon sales price of the herd was $47,167; and that Bert, Sr., had received $12,500 less in the transaction than that amount for the herd. Accordingly, the court held for the plaintiffs in the sum of $12,500.

The defendants took an appeal on the grounds that the evidence did not support the trial court's conclusion that the sale price of the cows was $47,167 and therefore they argued the judgment of $12,500 was erroneous. The plaintiffs cross-appealed from the portion of the judgment that sanctioned Bert's sale of his life interest and that concluded that sufficient consideration was given for the milk base.

We shall initially meet the defendant's contentions concerning the lower court's determination that the sale price was $47,167. In 1971, Eugene acquired Bert's interest in the dairy herd by assuming the farm's obligations at P.C.A. The Amator and Son account at P.C.A. at that time showed an indebtedness in the sum of $47,167. The court found, however, that a portion of that indebtedness, to wit, $12,500, was an indebtedness personally incurred by Eugene when he had purchased 1000 pounds of milk base in 1968. From that finding it followed that Eugene had assumed a debt of Bert's of only $34,667 which was $12,500 less than the agreed upon sale price of the cows and, thus, that Eugene was liable to the estate of Bert in that amount. On appeal it is argued that the record is devoid of any evidence that the sale price was actually agreed upon to be $47,167.

■ We cannot agree. We have reviewed the entire record and have found several instances where Eugene himself testified that he assumed all of the mortgages at P.C.A. totalling what he believed to be around $46,000 in exchange for the cows. That $46,000 figure was later refined by subsequent testimony and evidence to be $47,167. This court will not disturb the trial court's determination when it is supported by any reasonable evidence. *O'Hern v. Bowling*, 109 Ariz. 90, 505 P.2d 550 (1973). We accordingly affirm the trial court's finding that the sale price of the cows was $47,167.

The plaintiffs, as cross-appellants, present issues of a more substantial nature. They claim on appeal that Bert, as life tenant of the herd, was merely a "trustee" of the life estate property and as such he was without authority to sell the dairy herd outright. They further argue that Eugene, having purchased the herd, became a "successive trustee" of the herd and was thereby responsible as a fiduciary to the "co-beneficiaries" of the alleged trust, namely, the remaindermen of the life estate, for an accounting of the profits received from the sale of the herd by Eugene to a third party in 1972 and 1973. It is also maintained that the milk base was a part of the dairy operation and hence was property in which Bert had only a life estate and, as such, was not subject to disposal by the life tenant pursuant to the plaintiff's interpretation of Alice's will.

Preliminary to our consideration of the life tenant's authority to dispose of the property, we need first meet the defendant's contentions that the assets here at issue were not subject to the life estate but rather were Bert's free and clear from the constraints of the life estate to do with as he pleased.

■ It is undisputed that a life estate was indeed bestowed upon Bert in an undivided one-half of the 40 heifers, 55 cows and certain farm machinery. It is argued by the plaintiffs that, in addition, Bert had only a life estate in the milk base. The court below found that the milk base was not subject to Bert's life estate and we agree with that determination. Alice died in 1953 and the life estate was established through her will in Bert at that time. The concept of a milk base was not developed until six years later at which time the farm made its purchases thereof as a partnership using partnership profits. Since there was no evidence to show that the milk base was purchased with life tenancy assets or that it represented a change in the form of any life tenancy property and since it did not exist until six years after the life estate was created, we cannot see how the milk base could possibly constitute a part of the life estate. Accordingly, we hold that the milk base was not life estate property and, therefore, is not now subject to the claims of the remaindermen.

As concerns the farm machinery devised to Bert, it was found to have a value of zero in the final decree of distribution of Bert which determination is undisputed and it is therefore not involved in this litigation. The real estate of the farm is not involved, having been partitioned pursuant to an out-of-court settlement.

We are thus left to consider the 95 cows and heifers, one-half of which Alice left to Bert for life in 1953. Our determination of whether any part of the herd owned and sold by Bert in 1971 was a life estate asset must be guided by the Uniform Principal and Income Act, A.R.S. §§ 14–7401 et seq. (formerly 14–1081 et seq., renumbered and amended, not here in material part, in 1973). Section 14–7403(C) reiterates the common-law rule applicable to the apportionment of income and principal between life tenants and remaindermen. In essence, it provides that the income derived from the principal of the estate shall be retained by the life tenant while the principal itself shall be held for eventual transmittal to the remaindermen. At trial there was testimony given that the average life of a dairy cow is about eight years and in the case of *In re Snow's Will*, 192 Misc. 769, 84 N.Y. S.2d 472 (1948), the life of a milk cow was recognized to be less than fifteen years. In any event, we think it is safe to presume that the animals comprising the original herd here had perished and those which were sold by Bert in 1971 were comprised solely of the original herd's progeny. Thus, the issue we need decide is whether the original herd's offspring constituted income or principal of the estate.

Section 14–7408 is expressly applicable when the principal is comprised of animals. That section, in pertinent part, reads as follows:

". . . where the animals are held as a part of the principal partly or wholly because of the offspring or increase which they are expected to produce, all offspring or increase shall be deemed principal to the extent necessary to maintain the original number of such animals and the remainder shall be deemed income . . ." A.R.S. § 14–7408.

■ Dairy herds, of course, are held partly to propagate their numbers and, thus, keep the dairyman's business operating, if not expanding in size. Hence, pursuant to § 14–7408, the offspring of the herd to the extent of the size of the original life estate property, should be deemed principal and not income and thus remained subject to the life estate. We hold then that the number of cows held by Bert in 1971 necessary to maintain the size of the original herd in which he had a life estate constituted life estate assets.

We next consider whether Bert, as life tenant of an undivided one-half interest in the herd, had the authority to sell the cows to Eugene, and if he did not, what consequences flow therefrom.

■ To determine the extent of the power vested in a life tenant, we must look to the document which created the estate, namely, Alice Amator's will. *Southwick v. Southwick*, 184 Iowa 336, 168 N.W. 807 (1918). In construing a will, it is elementary that we look primarily to the intent of the testator. *LaTourette v. LaTourette*, 15 Ariz. 200, 137 P. 426 (1914); *Isaak v. Superior Court*, 103 Ariz. 445, 443 P.2d 911 (1968). The pertinent paragraphs of Alice's will, in which the property was devised to Bert and the children, as remainders, read as follows:

"*Third*: All my property . . . I give, devise and bequeath unto my said husband, BERT AMATOR, to have and to hold unto him for and during the period of his lifetime only or until he remarries.

"*Fourth*: All of the rest, residue and remainder of my property . . . subject to the life estate therein of my said husband or until he remarries, I give, devise and bequeath, share and share alike unto my children . . ."

■ Where a life estate has been given, a power of sale of the life tenancy property is not to be found absent language in the estate-creating instrument indicating an intent to confer such a power:

"[W]here the words in their usual and ordinary signification indicate a purpose to devise only a life estate, with the remainder over, the right of the life tenant to divest the remainderman by sale during the continuance of the life estate ought clearly to appear in the instrument itself, or, at least, it ought to be necessarily implied in the instrument from its wording." *Southwick v. Southwick,* 168 N.W. at 808.

■ Obviously there is no affirmative grant in the will to Bert of the power to sell or dispose of the life estate property. The defendants nevertheless argue that the phrase "to have and to hold" gives Bert the power to sell the property and that the use of the term "rest, residue and remainder" implies a power in Bert to consume or sell the property, arguing that it gives to the remaindermen only that portion which is unused or left when the life tenant dies. We cannot agree with this interpretation of the will.

First of all, the specific phrase "to have and to hold" found in the third paragraph of the will hardly could be interpreted to demonstrate in itself an intent to confer the power to sell. On the contrary, we think that although the phrase does manifest an intention that the life tenant take custody of and retain the property, it specifically instructs that the tenant "hold" the property and that he do so "for and during the period of his lifetime."

In the case of *Walker v. Sturgis,* 47 Ill. App.2d 251, 198 N.E.2d 131 (1964), the will there under scrutiny devised property to the testator's wife "to have and to hold during her natural life . . . for her comfort and support." That language, which we note is broader than that used in the case at bar, was held not to confer a power of sale upon the life tenant. Numerous other cases have held similarly, given the same or similar language, and we concur in the decisions of those cases. *See, e. g., Fields v. Kline,* 161 Ark. 418, 256 S.W. 355 (1923); *Southwick v. Southwick, supra*; *Scott v. Scott,* 137 Iowa 239, 114 N.W. 881

(1908); and *Jessup v. Fenton,* 47 App.Div. 622, 62 N.Y.S. 308 (1900).

The devise of the "rest, residue and remainder" cannot be interpreted to imply a power in the life tenant to sell or dispose of the life tenancy property. We understand that phrase to be a legal term of art used either to describe property of one's estate not specifically granted in one's will or, in other cases, to describe and establish an interest in remainder. As such, absent further language demonstrating an intent that the remaindermen take only what was left undisposed of by the life tenant, we will not read that language to infer a power of sale in the life tenant.

The case of *In re Suttner's Estate,* 348 Pa. 159, 34 A.2d 483 (1943), although dealing with a power of consumption instead of a power of sale, is here instructive. There, the testator devised all of his property to his wife for life with the "residue and remainder" of his estate to go to his children at her death. It was argued that the use of the terms "residue" and "remainder" expressed an intent to confer a power to consume, but the court rejected their argument finding those words to be technical legal terms with a definite meaning which must be given their proper effect. The court therefore refused to enlarge the normal meaning of the term and concluded that the power to consume was not implied therein.

The cases the defendants have relied upon to support their position we think to be readily distinguishable. In each of the cases cited a power of sale was found to exist in the life tenant. However, in each of those cases the language used was easily interpretable as inferring the power of sale. For example, in *Loud v. Poland,* 126 Me. 45, 136 A. 119 (1927), the will devised to the remaindermen "whatever remains." In *Stewart v. Stewart's Estate,* 148 Me. 421, 94 A.2d 912 (1953), the will devised certain property for life with a gift over of "the same or what remains." And in the case of *In re Garrity's Estate,* 108 Cal. 463, 38 P. 628 (1894), the remainder interest was comprised of the life estate property "remain-

ing" at the termination of the life estate. *See also Smith v. Teel,* 35 Ariz. 274, 276 P. 850 (1929) ("whatsoever remains"). Each of the quoted phrases is distinguishable from the term "rest, residue and remainder" insofar as each of them infers that there may *not be anything left when the life tenant dies.* That is, the language indicates an intent that the remaindermen take only that which is still intact after the life beneficiary has gotten through with it. The phrase here in question, however, does not so necessarily require such an interpretation. Moreover, as a term of art which bears a meaning certain and definite, we feel constrained not to give it an effect which is not necessarily implied or intended. We refuse to find in the use of the term "rest, residue and remainder" an implied grant of the power of disposition of the life estate assets.

Based on the foregoing analysis of the will, we are unable to ascertain an intent to confer upon Bert as life tenant the authority to dispose of the property. Having so concluded, we must next determine whether any remedy is accordable the remaindermen.

The plaintiffs here sued not the life tenant or his estate but rather a co-remainderman who had purchased the corpus of the estate. The plaintiff's attack on their co-remainderman is based on their assumption that a "trust" was created by Alice with Bert as trustee. According to their argument, Eugene was either a "successive trustee" having purchased the corpus of the trust or a "co-beneficiary" under the "trust," thereby owing certain fiduciary duties to the other beneficiaries. They maintain that he has acted in contravention to his fiduciary duties and is therefore liable to his co-beneficiaries.

■■ We cannot agree with this line of thinking. The whole argument is premised on a trust theory but there is no trust here involved. Conceding that a life tenant has ofttimes been referred to as a trustee or quasi-trustee, it must be recognized that "the life tenant is a trustee only in a limited sense in that he cannot injure or dispose of

the property to the injury of the rights of the remainderman." *Barnes v. Barnes,* 207 Va. 114, 148 S.E.2d 789, 793 (1966); *see also Seymour v. National Biscuit Co.,* 107 F.2d 58 (3d Cir. 1939), *cert. denied,* 309 U.S. 665, 60 S.Ct. 590, 84 L.Ed. 1012 (1940). Thus, although the relationship of life tenant and remainderman is in the nature of a trust, a technical legal trust is not involved. As a result, the alleged fiduciary duties of what the plaintiffs term the "successive trustee" or "co-beneficiary" between remaindermen are not to be found. Since no cases have been cited to us and we have found none which have imposed on remaindermen a fiduciary duty owed to their co-remainderman, we will not now impose such a duty. No duty existing, we cannot see how Eugene has committed any wrong to which he should now be held accountable.

■ Rather, it appears that the proper party from which the remaindermen are required to seek recourse is the estate of the life tenant. *Riegel v. Oliver,* 352 Pa. 244, 42 A.2d 602 (1945). The most appropriate remedy in a situation where the tenant is about to make a sale of the life tenancy property is an action to enjoin the sale. That course was not here taken and the sale having been consummated and the property since having been sold to a third party, the remaindermen are left to proceed against the estate of the tenant to have a life estate impressed on the proceeds of the sale of the herd and to obtain an accounting to determine the amounts due the remaindermen and to ascertain the amount of damages sustained, if any, as a result of the life tenant's unauthorized sale of the property. 31 C.J.S. *Estates* § 135, p. 250.

■ Nor will we impose a constructive trust on the proceeds Eugene received from the subsequent sale of the cattle as the plaintiffs have urged we do. A constructive trust is a remedial device which is imposed only when

"[T]itle to property has been obtained through actual fraud, misrepresentation, concealment, undue influence, duress, or through any other means which render it

unconscionable for the holder of legal title to continue to retain and enjoy its beneficial interest." *In re Estate of Rose,* 108 Ariz. 101, 104, 493 P.2d 112, 115 (1972).

There was no fraud, misrepresentation, concealment, undue influence or duress found to exist here, and since Eugene paid valuable consideration in the exchange, we cannot see how it would be unconscionable for him to retain that which he bargained for. The imposition of a constructive trust is therefore clearly inappropriate in this case.

In conclusion, we hold that the trial court erred in its determination that the life tenant had the authority to dispose of the life estate assets. We further hold, however, that the trial court was correct in its judgment that Eugene was not liable to the other remaindermen other than in the sum of $12,500 less Eugene's one-sixth portion. This last finding we have held to be supported by the evidence. If the ultimate judgment of the trial court is correct as a matter of law, we will sustain that judgment although the basis of that judgment may be incorrect. *Minderman v. Perry,* 103 Ariz. 91, 437 P.2d 407 (1968).

Accordingly, we affirm the judgment of the court below.

HOLOHAN and GORDON, JJ., concur.